# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
January 31, 2018 Session

## IN RE: SAMUEL P.

**Direct Appeal from the Juvenile Court for Shelby County**
**No. Y0740      William A. Peeler, Special Judge**

_____

### No. W2016-01665-COA-R3-JV

_____

This appeal involves a long-running dispute between unmarried parents over parenting issues concerning their young son. After years of contentious and continuous litigation and eight days of trial, the trial court found the father in criminal contempt and modified the parties' existing parenting arrangement to reduce the father's parenting time somewhat and to grant the mother sole decision-making authority for major decisions. The trial court imputed income to the father for purposes of child support and awarded current and retroactive child support. The trial court also awarded the mother a portion of her attorney's fees. The father appeals, challenging each of these rulings. We vacate the trial court's imputation of income and child support awards and remand for additional findings regarding Father's income, but we otherwise affirm the trial court on all other issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in part, Affirmed in part and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Brice Moffatt Timmons, Memphis, Tennessee, and Brian L. Schuett, Bowling Green, Kentucky, for the appellant, J. Vincent P.

Rachel Emily Putnam and Nelson T. Rainey, Memphis, Tennessee, for the appellee, Cynthia Ann P.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

J. Vincent P.[1] ("Father") and Cynthia P. ("Mother") are attorneys who dated and had a child out-of-wedlock. Before the child was born, Father filed a petition to establish paternity and alleged that he was fit to have custody of the child. Days after being served with the petition, Mother went into preterm labor and gave birth to the child, Samuel, in May 2012. Samuel was ten weeks premature and weighed two pounds. He spent six weeks in the neonatal intensive care unit and was discharged to Mother weighing four pounds. The parties have continuously battled over parenting time and related issues ever since.

Because both parents routinely practice in the juvenile court of Shelby County, Judge William Peeler, the juvenile court judge in Tipton County, was appointed as special judge to preside over the case on August 8, 2012. The parties filed numerous petitions and litigated countless issues over the next four years. According to Judge Peeler, this was "one of the most bitter, contentious, and litigious cases" he had seen during his 27 year tenure on the bench. Indeed, the record of the proceeding during this young child's life fills four banker's boxes.

Mother began her efforts to obtain information regarding Father's financial situation, for purposes of calculating child support, shortly after the proceedings began in 2012. Father has an LL.M. degree in taxation and works as a solo practitioner doing estate and tax work, among other things. However, his 2011 tax return reported a negative total income and negative adjusted gross income. Mother claimed that Father was in fact a successful attorney and that his tax returns were unreliable. Accordingly, she claimed that it was necessary to examine various underlying documents and additional sources of information in order to determine Father's true income. Mother ultimately filed motions to compel and sought sanctions due to Father's alleged failure to produce adequate information regarding his income. The trial court granted Mother's motion to compel and ordered Father to cure his discovery deficiencies.

---

[1] It is the policy of this Court to use only the first name and last initial and, in some cases, just the initials of the parties involved in juvenile court actions to protect the privacy of the children involved.

Meanwhile, in the year after Samuel was born prematurely, he failed to meet certain developmental milestones. When he turned one in May 2013, he was not yet sitting unassisted, crawling, or walking.

The parties attended mediation for three days in May 2013 and finally reached an agreement as to parenting time and joint decision-making. They agreed to a parenting schedule with four phases, whereby Mother was named primary residential parent, but Father would gradually increase his parenting time over the next two years until the parties shared equal parenting time. Although the parties followed this phased parenting schedule after mediation, they did not seek court approval of an actual parenting plan or custody order for several months. Also, the parties had been unable to reach any agreement regarding child support due to their ongoing dispute over discovery of Father's financial information.

In February 2014, Father finally sought court approval of the mediated parenting plan from May 2013, with the section regarding child support left blank. Father's motion alleged that numerous disputes had arisen regarding parenting time and decision-making but were ultimately resolved by the attorneys. He claimed that the mediated parenting plan should be reduced to a written order so that future disputes would be less likely to occur.

Before any action was taken on Father's motion, on May 7, 2014, Mother filed a petition to modify the mediated (but not yet court-approved) parenting plan from May 2013, alleging that a material change in circumstances had occurred. She alleged that Father had refused to cooperate with her in the year since mediation and that joint decision-making was simply not possible. For example, Mother alleged that Father unilaterally enrolled Samuel in a new preschool without prior notice to her and refused to participate in good faith in the parties' parenting counseling sessions. Mother also alleged that Samuel, by then age 24 months, was still not walking independently despite ankle braces and had been diagnosed as developmentally delayed by his pediatrician. She alleged that joint decision-making was not in Samuel's best interest because Father disregarded Mother's opinions and Samuel's developmental needs. She also claimed that Samuel had a greater need for continuity and stability due to his developmental delays. Mother asked the trial court to modify the mediated (but not yet court-approved) parenting plan to name her final decision-maker for all major decisions and to maintain

3

the parenting schedule in the current phase rather than increasing Father's parenting time to the additional and final phase of equal parenting time.[2]

Before Mother's petition to modify was heard, the trial court, on May 30, 2014, entered an order approving the parties' mediated parenting plan from May 2013 (without resolving the issue of child support). Father filed a response to Mother's pending petition to modify in which he agreed that the parties' meetings and conversations were unproductive, but he blamed Mother for being uncooperative. He also claimed that further mediation was necessary, according to the mediated parenting plan, prior to further proceedings regarding modification. The parties returned to mediation as ordered by the court. However, the only issue the parties were able to agree on at mediation was that they would submit to a Rule 35 forensic custody evaluation by Dr. Fred Steinberg,[3] with both parties being responsible for the cost of their own evaluation. The trial court entered an agreed order to that effect on September 8, 2014. The case was set for trial to begin on January 26, 2015. At a pretrial status conference in December 2014, Father requested a continuance of the January 26 trial date based on his assertion that Dr. Steinberg would not have his report completed in time, but the trial court denied Father's request.

On January 6, 2015, Dr. Steinberg notified both parties that his report was complete and requested payment of the final balance they owed for the evaluation. Dr. Steinberg informed the parties that his report would not be released unless he received full payment from both parties.[4] Mother paid her balance that same day, but Father failed to pay his balance of roughly $1,632 despite numerous messages from Mother's counsel in the days that followed. On January 14, 2015, Father filed a motion to continue the January 26 trial date, stating, among other things, that "[t]o date, Mother and Father do not have the report from Fred Steinberg, Ph.D. in this matter. Thus, the parties' attorneys have not been able to review the report, schedule his deposition, etc." The next day, Dr. Steinberg notified the court that his report was completed on January 6, that he had

---

[2] By this time, the parties were following phase three of the mediated parenting schedule, whereby Father had parenting time every other weekend, from Friday evening until Monday morning, and one additional overnight per week.

[3] Tennessee Rule of Civil Procedure 35.01 provides, in pertinent part,

> When the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . .

[4] Dr. Steinberg's written policy and procedure statement likewise provided that his report would only be provided "after all charges and all estimated charges relevant to the matter have been paid in full." Father signed this document in October 2014.

advised both parties that the report would be released once all fees were paid, and that Father had not paid his balance. During a conference call with Judge Peeler on January 21, 2015, Father's attorney claimed, for the first time, that Father was financially unable to pay the amount owed to Dr. Steinberg, and therefore, a continuance of the trial date was necessary. The trial judge continued the trial at Father's request and ordered him to pay Dr. Steinberg within thirty days. Father paid Dr. Steinberg on the thirtieth day.

Because Mother's petition to modify the parenting plan still had not been heard, on April 23, 2015, Mother filed a petition to suspend the parenting plan insofar as it provided for the fourth and final phase of Father's increased parenting time to begin on May 16, 2015. Mother noted that the parties agreed to the parenting plan during mediation when Samuel was 12 months old; it was approved by the court when he was 24 months old, and by this time, he was almost three. Mother alleged that a material change in circumstances had occurred even since the entry of the parenting plan order, warranting modification of the plan. She alleged that Father's anger toward her had worsened and that he had also engaged in conflict with the director of Samuel's preschool and enrolled Samuel in yet another preschool without prior notice. Mother claimed that Father went out of his way to undermine her by habitually returning the child late to parenting exchanges, changing day care facilities again in April 2015, and intentionally excluding her from healthcare decisions for the child. Mother insisted that joint decision-making with Father was simply impossible because Father prioritized his own "rights" above Samuel's best interest, and she repeated her request to be designated as the sole decision-maker. Mother also claimed that maintaining the current parenting schedule was in Samuel's best interest, but she asked that Father be required to return Samuel on Sunday evening rather than Monday morning after his parenting time every other weekend.

Mother's April 23, 2015 petition also asserted numerous counts of contempt against Father. She alleged that Father purposefully refused to obey the order to pay Dr. Steinberg for his share of the evaluation in order to delay the trial. According to Mother's petition, she subsequently obtained documents via subpoena that revealed Father had sufficient funds to pay for his share of the report in January 2015, in spite of his representation to the contrary. She alleged that Father's conduct was offensive to the dignity of the court and demonstrated an ongoing disregard for the court's authority, such that he should be held in criminal contempt. Mother also asked the court to find Father in contempt for various violations of the parenting plan, such as returning Samuel to parenting exchanges more than 15 minutes late over 50 times, excluding her from Samuel's medical appointments and healthcare decisions, unilaterally enrolling Samuel in another preschool without prior notice, denying her parenting time for a planned

vacation, claiming Samuel for an exemption on his tax return during Mother's designated year, and disregarding the court's orders regarding discovery. Mother asked the court to sanction Father pursuant to Tennessee Rule of Civil Procedure 37.02 by establishing his income at $20,000 per month for the purpose of calculating child support.[5] She also asked the court to find Father in civil and/or criminal contempt for each of the counts mentioned above.

The trial court entered an order staying phase four of the parenting plan and to maintain the existing parenting schedule pending trial. In June 2015, just before trial, Samuel was diagnosed with cerebral palsy. The trial began on July 31, 2015. Generally, the trial court heard testimony regarding the contempt allegations first then moved to the issues regarding modification of the parenting plan. However, the trial judge decided that he would not resolve the issue of child support until he made a ruling regarding parenting time. Over the course of seven days between July 31, 2015, and October 26, 2015, the trial court heard testimony from Mother, Father, Dr. Steinberg, a clinical psychologist retained by Father to review Dr. Steinberg's evaluation, Samuel's physical therapist, Samuel's case manager from the Shelby County school system, the director of Samuel's preschool, Father's mother, Father's cousin, and Father's friend. The testimony of these witnesses regarding the issues on appeal will be discussed later in this opinion as needed.

On March 17, 2016, the trial court entered an order addressing many of the issues before the court but reserving a decision on others. Regarding the counts of contempt, the trial court first described the situation involving the payment to Dr. Steinberg and Father's assertion, through his counsel during the January 21, 2015 conference call, that Father was destitute and lacked sufficient funds to pay for his share of the report. The trial court noted that it granted Father's request for a continuance based on this

---

[5]Tennessee Rule of Civil Procedure 37.02 provides, in pertinent part, that if a party fails to obey an order to provide or permit discovery,

> the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
> . . . .
> (D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination; . . . .

representation. Based on the evidence presented by Mother at trial, the trial court found that Father made "a false representation to the Court." The court found that after the agreed order was entered on September 8, 2014, obligating Father to pay for his share of the evaluation, Father entered into an advertising contract with a local television station at a total cost of $36,000, payable in monthly installments of $3,000. Father's bank records indicated that in January 2015, when he declined to pay Dr. Steinberg and represented to the court that he was destitute, he paid $14,000 to his parents and had over $40,000 available in credit and cash advances on his credit cards. Accordingly, the trial court found that Father had access to cash well in excess of the $1,632 he owed to Dr. Steinberg. The trial court found that Father chose to make payments of $1,698 on his Mastercard and $3,886 on his American Express card on January 12, 2015, after Dr. Steinberg requested payment on January 6, when no minimum payment was due on either card. The trial court found that Father had funds to meet many other obligations and chose to save a little bit of interest and insist on a continuance of the trial even though it inconvenienced the court and impacted its busy schedule. The court found that Father delayed the trial willfully and without just cause and accordingly found him guilty of criminal contempt beyond a reasonable doubt.

The trial court also found Father in civil contempt for numerous violations of the parenting plan, including returning Samuel late intentionally and habitually without regard for Mother's schedule, failing to notify Mother of Samuel's medical appointments, claiming Samuel on his tax return, and failing to comply with discovery orders regarding his finances. The trial court found that Mother made exhaustive efforts to secure Father's financial records beginning in 2012 and continuing throughout the litigation and that Father purposefully concealed his financial information. The court found that Father produced "volumes of bank records" but redacted critical information without court permission, causing confusion and frustrating the court's ability to assess income for purposes of child support. The court found that after three years, Father still had not produced adequate documentation to establish his income. The order states,

> The Court finds by clear and convincing evidence that Father is guilty of civil contempt for his failure to comply with discovery orders regarding financial discovery. The Court finds that Father should be sanctioned for his willful conduct and further, he has still failed to submit any reliable and trustworthy evidence of his income pursuant to the Guidelines, Father's income for the purpose of calculating child support shall be imputed in the amount of $10,000.00 per month.

The order directed the parties to submit proposed child support worksheets using the imputed income figure of $10,000 for Father, after which the trial court would establish child support in accordance with the child support guidelines. Aside from this discussion about the imputation of income, the order did not otherwise punish Father for the counts of contempt.

The trial court also granted Mother's petition to modify the parenting plan regarding joint decision-making and the parenting schedule. The trial court found that a material change in circumstance had occurred in that Father had intentionally undermined Mother's ability to make decisions about the child's daily care, medical care, daycare, education, and upbringing.[6] In fact, the court found that when Mother made any request of Father pertaining to the child, "Father went out of his way to do the opposite." The court found that Samuel's medical diagnoses led to medical decisions that had to be made jointly by the parties, and the court found unequivocal proof that Father was simply unable to make joint decisions with Mother. The trial court noted Dr. Steinberg's finding that Father put his own agenda of engaging in conflict with Mother over his consideration of Samuel's best interest and prioritized his perception of receiving equal justice over things that could be beneficial to Sam. The court found that Father had obstructed and caused significant delay in Samuel's receipt of physical and developmental therapy for illogical reasons, engaging in "gamesmanship and controlling behavior." As such, the trial court named Mother sole decision-maker for all medical, educational, extracurricular, and religious decisions regarding Samuel. In light of Samuel's special needs, the trial court also reduced Father's parenting time somewhat, to every other weekend and one evening visit per week, in order to provide Samuel with greater stability and consistency.

Finally, the trial court found that Father's conduct left Mother with no choice but to seek relief in order to protect the best interest of the child. The court found that Mother was entitled to an award of reasonable attorney's fees, and it directed her attorney to submit a sworn statement of time and expenses, which the court would review to determine the amount to be awarded.

Before the issues of child support, attorney's fees, and punishment for the contempt were resolved, Father sought an extraordinary appeal to this Court, which was

---

[6]The court found that Father's inability to co-parent and engage in joint decision-making was evidenced by his needlessly enrolling Samuel in two day care facilities without prior notice to Mother, intentionally excluding Mother from medical appointments and healthcare decisions, repeatedly returning the child late, and undermining their co-parenting counseling.

denied. He also filed a motion for recusal of Judge Peeler, which was also denied. This Court affirmed the denial of the motion to recuse in *In re Samuel P.*, No. W2016-01592-COA-T10B-CV, 2016 WL 4547543 (Tenn. Ct. App. Aug. 31, 2016). After these issues were resolved, the trial court held a hearing on the issue of child support on December 5, 2016. The court considered evidence of Mother's income but did not revisit its decision to impute $10,000 per month to Father. On January 20, 2017, the trial court entered an order in which it found that the child support worksheets submitted by Mother contained accurate figures and calculations of current and retroactive child support in accordance with the child support guidelines. Father's child support obligation was set at $1,850 per month, and he was ordered to pay retroactive support in the sum of $70,888.

As punishment for the single count of criminal contempt for making false representations to the court to obtain a continuance, Father was sentenced to a fine of $50 and ten days in jail, with five days suspended.[7] The court stayed scheduling of Father's report date to jail pending the outcome of any appeal. The court noted that "[f]or [Father's] failure to comply with financial discovery he was sanctioned and that, along with other factors, resulted in his income being imputed." The court found that a reprimand, without further punishment, was appropriate for those counts.

The trial court awarded Mother $111,749.12 in attorney's fees, plus suit expenses and interest, for a total award of $145,406.15. The court stated that it had reviewed the affidavit and itemized billing statements submitted by Mother, analyzed the *Wright* factors, and utilized its experience based on 27 years as a juvenile court judge, and found the services rendered over four years of complex litigation were reasonable and necessary to protect the best interest of the special needs minor child.

Father timely filed a notice of appeal to this Court.

---

[7]Judge Peeler explained in his order that he was the only general sessions and juvenile court judge serving Tipton County and its 65,000 constituents and that he had an extremely heavy docket. The order states that his calendar was cleared to enable him to come to Memphis for the trial of this matter, and the improper continuance resulted in important matters being needlessly delayed and frustrated the work of the court and the administration of justice. The order states that the court also held Father to a higher standard and found his conduct particularly egregious in light of the fact that he is an attorney and officer of the court.

## II. ISSUES PRESENTED

Father lists the following issues for review on appeal:

1.      Whether the Trial Court committed reversible error by failing to adjudicate the criminal contempt matter separately from the civil issues in the case;

2.      Whether the Trial Court committed reversible error by finding Father in criminal contempt without pointing to an order that Father violated and predicated on statements his counsel allegedly made outside the record;

3.      Whether the Trial Court erred in finding that there was a material change of circumstances that supported a modification of the parenting plan;

4.      Whether the Trial Court committed reversible error by imputing income to Father based on a factually unsupported finding that he was concealing income;

5.      Whether the Trial Court committed reversible error by accepting Mother's proposed child support worksheets when there were clearly erroneous deductions to her income;

6.      Whether the Trial Court committed reversible error by awarding attorney fees to Mother in its final order when it expressly denied Father's counsel an opportunity to challenge the reasonableness of the fees; and

7.      Whether the Trial Court erred in refusing to disqualify Mother's counsel, who was an important fact witness regarding the interaction of the parties and Father's parenting of Samuel.

For the following reasons, we vacate the trial court's order as it pertains to imputation of income and child support and remand for further proceedings, but we affirm the trial court's decision on all other issues.

## III. DISCUSSION

### A.    Contempt

### 1.    Separate Hearings

The first issue raised by Father on appeal is whether the trial court erred by failing to adjudicate the criminal contempt matter separately from the civil issues in the case. Father argues that "this Court should hold that the simultaneous trial of criminal contempt with civil contempt and a custody modification renders all three proceedings 'fundamentally flawed.'" The record reflects that the trial court generally heard testimony regarding the contempt allegations first and then heard testimony regarding the remaining issues. Mother and Father both testified twice -- during both phases of the trial. Still, Father argues that the entire proceeding was "irrevocably tainted" and "fundamentally flawed" because the *criminal* contempt matter was not tried separately, and therefore, we must reverse the orders on contempt and custody modification.

This Court rejected a similar argument in *Norfleet v. Norfleet*, No. M2013-00652-COA-R3-CV, 2014 WL 1408146, at *3 (Tenn. Ct. App. Apr. 9, 2014), *perm. app. denied* (Tenn. Aug. 27, 2014), where a parent argued that a trial court committed reversible error by trying criminal and civil contempt in the same proceeding and in conjunction with the trial of a petition for modification and an order of protection hearing. We acknowledged some previous cases stating that civil and criminal contempt proceedings should not be tried simultaneously. *Id.* at *5 (citing *Cooner v. Cooner*, No. 01A01-9701-CV-00021, 1997 WL 625277 at * 15 (Tenn. Ct. App. Oct.10, 1997)). Still, we found "nothing in [the simultaneous] hearing that rises to the level of reversible error." *Id.* We noted that "the practice of combining claims for civil and criminal contempt in the same proceeding has sometimes been criticized," but, we added, "it is not at all uncommon." *Id.* at *6 n.5. We further explained,

> As for trying the contempt in the same proceeding as the modification petition and the order of protection, we acknowledge that such a practice involves the same difficulties as were mentioned by the *Cooner* court in regard to trying criminal and civil contempt in the same proceeding: that is, the differences in the respective burdens of proof and in the procedural rights of the parties. However, the same conduct that impels a party to seek enforcement or modification of a prior order of the court,

such as a failure to pay child support or a failure to comply with a parenting order, can also support an action for contempt.

Thus, even though it may be better in some ways to try contempt separately from other claims, it is not unusual for a contempt charge to be tried together with the case from which it arose, for reasons of judicial economy and for the convenience of the parties. In such cases, it is important for the trial court to keep the distinctions between the various claims in mind.

In the present case, the court stated at the outset of the hearing that it would be trying three different claims, and after hearing all the evidence it once again identified the three matters at issue and recited the evidence it relied on to reach its decision on each of them. The trial court clearly recognized the differences between the pleadings before it and the proof required for each. We find no reversible error in the trial court's reasoning or in its conduct of the proceedings below.

*Id.* at *6. *See also Duke v. Duke*, No. M2009-02401-COA-R3-CV, 2012 WL 1971144, at *9-10 (Tenn. Ct. App. June 1, 2012) (rejecting the appellant's argument that the trial court committed reversible error by considering criminal and civil contempt simultaneously in the same proceeding).

In the case at bar, the trial court attempted to separate the testimony about the contempt allegations from the matters of custody and child support by devoting the first few days of trial to the issues of contempt. However, Mother's petition for contempt cited many of the same alleged violations of the parenting plan that also served as the basis for her petition to modify the parenting plan. Father did not object to the trial court's procedure and even asked to call a witness relevant to the custody matter out of order during the contempt phase of the hearing. When Father's counsel noted that all of the issues were "intertwined," the trial judge stated that he could "sort through what is important regarding the issues of contempt and also what is important regarding the petition to modify." He directed Father's counsel to present his proof in any manner he wished and said, "I will certainly listen and weigh it for the various issues that the Court has to deal with." As in *Norfleet*, the trial court also recognized the distinctions between the various issues in its written order and clearly set forth the evidence it relied on for each decision. We discern no reversible error in the conduct of the hearings in the trial court.

## 2.    The Criminal Contempt Finding

Father also presents two narrow issues regarding the finding of criminal contempt. First, he argues that the trial court "committed reversible error by finding Father in criminal contempt without pointing to an order that Father violated." Father suggests that the trial court's criminal contempt finding was "predicated on the violation of no order[.]" His brief states, "Problematically, the Trial Court failed to determine whether Father was ordered to pay Dr. Steinberg, which he was not." Father acknowledges that the agreed order providing for the Rule 35 forensic custody evaluation provided, "Both parties shall be responsible for the cost of their own evaluation." The trial court expressly found that this agreed order "ordered both parties to equally divide the cost of the evaluation." Still, Father insists that the agreed order was insufficient to support a finding of contempt because it is ambiguous and failed to provide a specific deadline for payment or a specific sum to be paid. We disagree.

"One may violate a court's order by either refusing to perform an act mandated by the order or performing an act forbidden by the order." *Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510-11 (Tenn. 2005). To support a contempt finding based on disobedience of a court order, "the order alleged to have been violated must be clear, specific, and unambiguous."[8] *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354 (Tenn. 2008). When analyzing the clarity of the order allegedly violated, we utilize the following principles:

> A person may not be held in [] contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. The order must, therefore, be clear, specific, and unambiguous.

---

[8] We agree with Mother's position that Father was held in criminal contempt not so much for his failure to pay in accordance with the agreed order, but for his false representation to the court regarding his failure to pay. The trial court found Father "guilty, beyond a reasonable doubt, of one count of criminal contempt in that he made false representations to the court to obtain a continuance thereby willfully and without just cause delaying the trial in this cause." However, Mother's allegation of contempt seemed to also encompass his related act of failing to pay in accordance with the agreed order. The trial court's written order noted Mother's allegation "that Father's conduct, intentionally delaying the trial of this matter by refusing to pay Dr. Steinberg and thereby delaying the release of Steinberg's Report, is contemptuous and offensive to the dignity of the Court." As such, we have addressed Father's argument regarding the clarity of the order he allegedly violated.

13

Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of [] contempt. Orders need not be full of superfluous terms and specifications adequate to counter any flight of fancy a contemner may imagine in order to declare it vague. They must, however, leave no reasonable basis for doubt regarding their meaning.

Orders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed. Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge. Determining whether an order is sufficiently free from ambiguity to be enforced in a contempt proceeding is a legal inquiry that is subject to de novo review.

*Id.* at 355-56 (citations and footnotes omitted).[9]

Applying these principles to the case at bar, we conclude that the agreed order requiring both parties to be responsible for the cost of their own evaluation was sufficiently clear and unambiguous under the circumstances to enable a reasonable person, and Father, to know exactly what was required. Again, we must consider "both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed." *Id.*; *see also Furlong*, 370 S.W.3d at 339 ("We must take into account not only the circumstances of the alleged violation, but also the circumstances surrounding the issuance of the order and the circumstances of the one to whom it is addressed.").

Here, Father is a sophisticated attorney who knew, based on the denial of his previous request for a continuance, that Dr. Steinberg's report would be completed shortly before trial. He also knew, based on the policy and procedure statement he signed, that the report would not be released until Dr. Steinberg received full payment. When Dr. Steinberg demanded payment from Father on January 6, well in advance of the January 26 trial date, Father failed to pay for his share of the evaluation as he was obligated to do under the ordinary meaning of the agreed order. We find no *reasonable* basis to doubt the meaning of the agreed order and no support for Father's position that

---

[9]*Konvalinka* involved civil contempt, but its analysis has been held equally applicable to criminal contempt for disobedience of a court order. *See Furlong v. Furlong*, 370 S.W.3d 329, 336 (Tenn. Ct. App. 2011).

he was never actually ordered to pay Dr. Steinberg. Notably, Father does not challenge on appeal the trial court's finding that he had the financial ability to pay Dr. Steinberg. Instead of doing so within a reasonable time, Father represented to the court on January 21 that he was destitute and unable to meet what he understood to be his obligation – to pay for his one-half share of the evaluation. This resulted in a continuance of the January 26 trial date and a delay of several months in the proceedings.

The absence of a deadline does not excuse noncompliance or prevent a finding of contempt. *See Griffith v. Griffith*, No. M2003-01060-COA-R3-CV, 2004 WL 2663665, at *4 (Tenn. Ct. App. Nov. 22, 2004) (rejecting the argument that a criminal contempt finding based on failure to pay could not be sustained where the order "did not set a specific deadline for compliance," as the party required to make the payment at issue knew when the payment was due). "[I]n the absence of a deadline[,] a party should perform his court-ordered obligation within a reasonable amount of time." *Hill v. Hill*, No. M2007-00049-COA-R3-CV, 2008 WL 5100925, at *9 (Tenn. Ct. App. Dec. 3, 2008). For purposes of contempt, the court should consider whether the time interval between the order and the action taken was reasonable. *Id.* We conclude that the trial court's order was sufficiently clear and free from ambiguity, and the lack of a deadline did not foreclose a finding of criminal contempt when Father purposefully refused to pay within a reasonable time, despite having the financial ability to do so, in order to delay the trial.

Next, Father argues that the criminal contempt finding must be reversed because it was "predicated on statements his counsel allegedly made outside the record." Father's argument regarding this issue is somewhat difficult to discern. Father complains that the statements his attorney made during the January 21 conference call are not reflected in the record on appeal. However, Father admitted at trial that he requested a continuance of the trial date "via [his attorney's] office" because of his financial situation. Although the record does not contain a transcript of the conference call, the trial judge discussed it with the attorneys during trial, and Father's attorney acknowledged that he requested a continuance based on Father's claimed inability to pay:

> Q. Mr. [P.], my question was: Were you aware that your attorney made the representation to this Court on January 21st that you were without sufficient funds to pay the balance that was due to Dr. Steinberg and that [] - - for that reason, you couldn't obtain the report.
>
> MR. THOMAS: Are you referencing the motion or conference call or --
>
> MS. PUTNAM: I referenced the conference call on January 21st.

15

MR. THOMAS: Do you have a transcript of that?

MS. PUTNAM: Your Honor, I don't know that I have to respond to Mr. Thomas.

MR. THOMAS: I am just trying to figure out what she is talking about. *I agree that I told the Court that - -*

THE COURT: That's right. Then later you filed a written motion where you set out some additional - -

MR. THOMAS: Right. I am just trying to clarify what we were talking about.

THE COURT: But that was the main focus of our discussion on that day, was that he was having problems coming up with the money.

MR. THOMAS: *Correct.*

MS. PUTNAM: I was asking Mr. [P.] if he was aware that - -

THE COURT: All right. The Court will allow the question.

MS. PUTNAM: Thank you, Your Honor.

BY MS. PUTNAM:

Q.     Your answer was yes, Mr. [P.]?

A.     No. I think my answer was there was a motion filed, and the motion states for itself. I don't know what he represented to -- on a phone call that I wasn't a part of.

But I know that I called him up, and I had said, "Hey, man. I'm not going to have the money to pay anybody here. We got to figure something out."

(Emphasis added.)   Thus, the record contains sufficient evidence that these statements regarding Father's financial situation were in fact made by Father's attorney during the conference call.[10]   "An admission made by an attorney concerning factual statements is binding on the client." *Winbush v. Winbush*, No. 02A01-9809-CH-00248, 1999 WL 174131, at *2 (Tenn. Ct. App. Mar. 31, 1999).   Father's brief also states that at trial,

---

[10]We also note that Father, as the appellant, had the "burden to supply a complete and accurate record on appeal." *Church v. Church*, 346 S.W.3d 474, 486 (Tenn. Ct. App. 2010).   Accordingly, he cannot complain about the lack of any transcript on appeal reflecting his attorney's statements. *See Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997) (explaining that the appellant's failure to prepare a record on appeal presenting a complete and accurate account of what transpired in the trial court with respect to the issue results in waiver).

"[Father] acknowledged being aware of his attorney's representation to the Trial Court in January of 2015 that he lacked the funds to pay Dr. Steinberg." Thus, Father has not demonstrated that he is entitled to relief in connection with this issue.

## B. *Material Change of Circumstance*

Father's next issue is whether the trial court erred in finding that a material change of circumstance existed to support modification of the parenting plan. Again, Father's argument regarding this issue is rather limited. Specifically, he claims that Samuel's diagnosis with cerebral palsy cannot constitute a material change of circumstance because, according to Father, the diagnosis had already been made when the parenting plan was finally approved by the court. Father claims that Samuel was already receiving treatment prior to the entry of the parenting plan. Thus, Father asks this Court to find that Samuel's diagnosis was not a material change of circumstance and to reinstate the mediated parenting plan.

Neither party has raised any issue on appeal regarding whether it was necessary to demonstrate a material change of circumstance in the first place. However, we conclude that the material change of circumstance standard was inapplicable when Mother sought modification of the parenting plan that was entered in the midst of these proceedings. "If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest." Tenn. Code Ann. § 36-6-101(a)(2)(C). "'The concept of requiring a parent seeking modification to prove a material change in circumstances originated out of this Court's recognition that existing parenting orders are considered *res judicata* on the facts as they existed at the time the most recent order was entered.'" *Stricklin v. Stricklin*, 490 S.W.3d 8, 16 (Tenn. Ct. App. 2015) (quoting *Canada v. Canada*, No. W2014-02005-COA-R3-CV, 2015 WL 5178839, at *6 (Tenn. Ct. App. Sept. 4, 2015)). Accordingly, "[a] custody decision, 'once final,' is *res judicata*" as to the facts in existence when the decision was made. *Kennedy v. Kennedy*, No. M2016-01635-COA-R3-CV, 2017 WL 2713632, at *3 (Tenn. Ct. App. Jun. 23, 2017) (*no perm. app. filed*); *Hawk v. Hawk*, No. E2015-01333-COA-R3-CV, 2016 WL 901518, at *8 (Tenn. Ct. App. Mar. 9, 2016) (*no perm. app. filed*). "Final custody orders" are *res judicata* and cannot be modified absent a material change of circumstance. *Holley v. Ortiz*, No. M2015-01432-COA-R3-CV, 2017 WL 729754, at *8 (Tenn. Ct. App. Feb. 24, 2017) (*no perm. app. filed*). "After a permanent parenting plan has been incorporated into *a final order or decree*, the parties are required to comply with it unless and until it is modified as permitted by law." *C.W.H. v. L.A.S.*, -

-- S.W.3d ---, 2017 WL 6462395, at *5 (Tenn. Dec. 19, 2017) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 697 (Tenn. 2013)) (emphasis added).

However, this standard for modifying a custody order does not apply when there is no final custody order in existence and the parties are only operating under a temporary order. *See Dillard v. Jenkins*, No. E2007-00196-COA-R3-CV, 2007 WL 2710017, at *3-4 (Tenn. Ct. App. Sept. 18, 2007). Temporary custody orders are not entitled to the same res judicata protections as a final order. *McClain v. McClain*, No. E2016-01843-COA-R3-CV, 2017 WL 4217166, at *18 (Tenn. Ct. App. Sept. 21, 2017) (*no perm. app. filed*). Similarly, we have held that it was not necessary to show a material change of circumstance where the initial custody order the parties sought to modify did not become final due to the filing of a motion to alter or amend. *See DuBois v. DuBois*, No. M1999-00330-COA-R3-CV, 2001 WL 401602, at *6 (Tenn. Ct. App. Apr. 23, 2001); *Young v. Young*, No. 01A01-9801-CH-00047, 1998 WL 730188, at *3 (Tenn. Ct. App. Oct. 21, 1998). In those cases, we explained that when the parties sought modification of the non-final custody order through a motion to alter or amend, that situation did not present "a change of custody case" requiring a material change of circumstance. *Id.* Simply put, "the doctrine of res judicata does not apply when the judgment sought to be given res judicata effect is not final." *DuBois*, 2001 WL 401602, at *6 (quoting *Young*, 1998 WL 730188, at *3). As long as the judgment has not become final, the trial court may alter or amend it either on its own motion or at the request of one of the parties, as it may "change its mind" after reconsidering the proof and the applicable law. *Id.* By the same token, we have found the material change of circumstance standard inapplicable where the court's initial custody ruling was only an oral ruling and no final written order had been entered. *See Hughes v. Hughes*, No. M2013-01558-COA-R3-CV, 2014 WL 7181844, at *8 (Tenn. Ct. App. Dec. 16, 2014). However, in *Hughes*, we held that the trial court's application of the modification standard to consider the existence of a material change of circumstance was harmless error because the result, in that case, would have been the same under either analysis. *Id.* at *9.

Because of the unique circumstances of this case, the parties' mediated parenting plan (which failed to address child support) was not actually approved by the court for over a year. Even when it was ultimately approved by the court in May 2014, it was not incorporated into a *final* order or decree -- Mother's petition to modify had been filed before the entry of the parenting plan and remained pending, and the issue of child support was unresolved. In effect, then, the trial court was considering a petition to modify when no *final* order on custody or parenting issues existed. *See Hughes*, 2014

WL 7181844, at *8. Without a final order entitled to res judicata effect, it was not necessary for Mother to show a material change of circumstance.[11]

Ultimately, the trial court found that Mother had proven a material change of circumstance, and then the court found that modifying the mediated parenting plan was in Samuel's best interest. The first step of this analysis was unnecessary, but this error does not require reversal. *See Hughes*, 2014 WL 7181844, at *9; *In re M.R.*, No. M2007-02532-COA-R3-JV, 2008 WL 2331030, at *6 (Tenn. Ct. App. June 3, 2008) (stating that if no prior custody order existed, as the mother suggested, then the court's threshold finding that a material change of circumstance occurred was harmless error). "In a modification proceeding, after a threshold finding that a material change in circumstances has occurred, the court makes a 'fresh determination' of the best interest of the child" using the same factors that apply in an initial custody decision. *In re M.R.*, 2008 WL 2331030, at *6 (quoting *Gervais v. Gervais*, No. M2005-01483-COA-R3-CV, 2006 WL 3258228, at *3 (Tenn. Ct. App. Nov. 9, 2006); *Costley v. Benjamin*, No. M2004-00375-COA-R3-CV, 2005 WL 1950114, at *4 (Tenn. Ct. App. Aug. 12, 2005)).

On appeal, Father raises no issue regarding the best interest analysis. He only challenged the trial court's finding that a material change of circumstance was proven. Because that finding was unnecessary, Father has not demonstrated any reversible error in the court's analysis.

### C. Child Support

Father's next two issues deal with the calculation of child support. First, Father challenges the trial court's imputation of income to him. Secondly, Father argues that the trial court erred "by accepting Mother's proposed child support worksheets when there were clearly erroneous deductions to her income." We address these issues in turn.

---

[11]Our conclusion is not changed by the fact that the first parenting plan was formed during mediation. Trial courts are not bound by agreed upon permanent parenting plans. *Owen v. Haas*, No. M2013-00950-COA-R3-CV, 2014 WL 1327615, at *6 (Tenn. Ct. App. Apr. 1, 2014). A trial court should consider a mediated agreement between parents on parenting issues, but it is not bound by such an agreement. *Fletcher v. Fletcher*, No. M2010-01777-COA-R3-CV, 2011 WL 4447903, at *7 (Tenn. Ct. App. Sept. 26, 2011). "[T]he trial judge, and the trial judge alone, has the solemn duty to determine whether a given parenting arrangement is in the best interest of a child[.]" *Id.* at *10.

### 1. Father's Income

The Tennessee Child Support Guidelines presume that both parents contribute to the financial support of the child in pro rata proportion to the actual income available to each parent. Tenn. Comp. R. & Regs. 1240-02-04-.03(1)(a). As such, the fairness of a child support award depends on an accurate determination of each parent's gross income or ability to support. *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). Generally, a parent's gross income will be equivalent to his or her earning capacity or ability to support. *Id.* However, certain situations may arise in which a court may "impute" income to a parent. *Id.*

To "impute" income means to "assign or attribute an income level to the parent that may not reflect the parent's actual gross income." *Massey*, 315 S.W.3d at 795. The guidelines provide that imputing additional gross income to a parent is appropriate in three situations: if a parent is found to be willfully and/or voluntarily underemployed or unemployed; when there is no reliable evidence of income; or when the parent owns substantial non-income producing assets. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2). Here, the trial court found that Father "failed to submit any reliable and trustworthy evidence of his income pursuant to the Guidelines," and therefore, the court imputed $10,000 of monthly income to Father for the purpose of calculating child support. However, either additionally or alternatively, the trial court also characterized the imputation of income to Father as a sanction due to his civil contempt in the form of failure to comply with discovery orders regarding financial discovery. The trial court found that "Mother made exhaustive efforts to secure Father's financial records beginning in August, 2012," and by the time of trial in 2015, Father still had not produced financial records related to his law practice or underlying and supporting schedules, worksheets, or documents used to prepare his tax returns. According to the order, the trial court had previously found that "Father's tax returns were not a reliable source of information from which to determine Father's gross income and that an audit similar to what the IRS would require was appropriate." The court found that Father "produced volumes of bank records but redacted, without Court permission, critical information so as to cause confusion and frustration to the Court's ability to assess income for child support purposes." The trial court found that Father had "purposefully concealed his financial information for three years." "By the time of trial," the court found, Father "still had not produced adequate documentation to establish his income for child support purposes." The order states,

> The Court finds by clear and convincing evidence that Father is guilty of civil contempt for his failure to comply with discovery orders regarding

financial discovery. The Court finds that Father should be sanctioned for his willful conduct and further, he has still failed to submit any reliable and trustworthy evidence of his income pursuant to the Guidelines, Father's income for the purpose of calculating child support shall be imputed in the amount of $10,000.00 per month.

On appeal, Father argues that the trial court's choice of $10,000 per month was "beyond any basis in reality." According to Father, he produced over 2,000 pages of documents during discovery and therein provided reliable evidence as to his financial situation. Father also suggests that the trial court was limited to imputing the median gross income for male parents according to the guidelines, which is $37,589 per year. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(I)(III).

Before turning to any issue of sanctions, we will first consider whether the trial court's decision is in accordance with the guidelines. The guidelines recognize the importance of reliable information regarding a parent's current ability to support when establishing a support order. *Eatherly v. Eatherly*, No. M2000-00886-COA-R3-CV, 2001 WL 468665, at *4 (Tenn. Ct. App. May 4, 2001). They provide the following instruction for imputing income in the absence of reliable evidence of income:

(iv) Imputing Income When There is No Reliable Evidence of Income.

(I) When Establishing an Initial Order.

I. If a parent fails to produce reliable evidence of income (such as tax returns for prior years, check stubs, or other information for determining current ability to support or ability to support in prior years for calculating retroactive support); and
II. The tribunal has no reliable evidence of the parent's income or income potential;
III. Then, in such cases, gross income for the current and prior years shall be determined by imputing annual gross income of thirty-seven thousand five hundred eight-nine dollars ($37,589) for male parents and twenty-nine thousand three hundred dollars ($29,300) for female parents. These figures represent the full time, year round workers' median gross income, for the Tennessee population only, from the American Community Survey of 2006 from the U.S. Census Bureau.

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv). Pursuant to the guidelines, then, "if a parent fails to produce reliable evidence of income *and the trial court does not*

*otherwise have reliable evidence of income or income potential*, then the trial court may impute income to the parent" as set forth in this section. *In re Andrea R.*, No. M2014-01895-COA-R3-JV, 2015 WL 7749116, at *11 (Tenn. Ct. App. Nov. 30, 2015) (emphasis added). In other words, if the trial court has *no reliable evidence* of the parent's income or income potential, the guidelines set a precise dollar amount that should be imputed. *Smith v. Smith*, No. M2015-01038-COA-R3-CV, 2016 WL 3095067, at *4 (Tenn. Ct. App. May 24, 2016) (*no perm. app. filed*). However, a trial court may not impute the median gross income when reliable evidence of a parent's income or income potential has been presented. *Garrett v. Elmore*, No. M2013-01564-COA-R3-JV, 2014 WL 3763806, at *11 (Tenn. Ct. App. July 29, 2014). Rather, "the median income amount is only available in the event reliable evidence of a parent's income or income potential is not presented." *Id.* (citing *In re Brittany M.A.*, No. M2010-02173-COA-R3-JV, 2011 WL 4600435, at *3-4 (Tenn. Ct. App. Oct. 5, 2011)). "[T]he plain language of the Rule indicates that the median income amount is to be used as a fall back only when the court has no other reliable evidence of the [parent's] income or income potential." *In re Brittany M.A.*, 2011 WL 4600435, at *4. *See, e.g.*, *Armbrister v. Armbrister*, No. E2010-01561-COA-R3-CV, 2011 WL 5830466, at *5-6 (Tenn. Ct. App. Nov. 21, 2011) (rejecting a father's argument that the most the court could impute to him was $37,589 per year, as the court had before it reliable evidence of the parent's income *potential* and articulated a reasonable amount of income to be imputed to the father); *In re Brittany M.A.*, 2011 WL 4600435, at *4 (rejecting a mother's argument that the trial court was limited to imputing the $29,300 sum for females when the evidence presented was sufficiently reliable to determine her gross income).

The guidelines provide that "reliable evidence of income" may include "tax returns for prior years, check stubs, or other information" for determining the parent's ability to support. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(I)(I). However, "[t]his is neither an exclusive list nor is it an absolute bar to the court's consideration of testimony." *Garrett*, 2014 WL 3763806, at *9. Of course, the court may choose to disbelieve a parent's proof relative to his or her finances and deem it unreliable, even if it is the type of evidence listed in the guideline. *See, e.g.*, *Miller v. Welch*, 340 S.W.3d 708, 714 (Tenn. Ct. App. 2010) ("If Father's evidence as to his income is not accurate, then it is not reliable."). A parent's reported income may not truly reflect his or her ability to provide support. *Eatherly*, 2001 WL 468665, at *4. The guideline expressly provides that "other information" aside from tax returns or check stubs may be used as reliable evidence insofar as it allows the court to determine the parent's ability to support. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(I)(I). *See, e.g.*, *Massey*, 315 S.W.3d at 794 (affirming the trial court's decision to disregard tax returns and check stubs and set income based on a substantially larger income figure stated in the parent's mortgage application); *Parris v. Parris*, No. M2006-02068-COA-R3-CV, 2007 WL 2713723, at

*11 (Tenn. Ct. App. Sept. 18, 2007) (affirming an allocation of $149,228 in income based on a review of business checking account deposits and expenses even though the parent's tax returns claimed zero net income); *McDaniel v. McDaniel*, No. W2007-01587-COA-R3-CV, 2008 WL 5263605, at *7-8 (Tenn. Ct. App. Dec. 18, 2008) (involving income set solely based on the parent's testimony); *Brewer v. Brewer*, No. M2005-02844-COA-R3-CV, 2007 WL 3005346, at *10 (Tenn. Ct. App. Oct. 15, 2007) (concluding that a retirement account statement was reliable evidence of income).

Our supreme court has acknowledged that calculating child support "is much more difficult and much less precise when the [parent] is self-employed." *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). The guidelines specifically address self-employment income and provide that only "ordinary and reasonable expenses necessary to produce such income" may be deducted. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(3). Basically, "the guidelines require the trial court to consider all income of the [] parent, reduced only by reasonable expenses to produce the income." *Taylor*, 158 S.W.3d at 358. This rule recognizes "the potential of a self-employed [parent] to manipulate income for the purpose of avoiding payment of child support." *Id.* "[A] self-employed [parent] has the opportunity to manipulate his reported income by either failing to aggressively solicit business or by inflating his expenses, thereby minimizing his income." *Id.* (quotation omitted). Self-employment offers the opportunity to limit one's salary or other income even though the business could provide more. *Eatherly*, 2001 WL 468665, at *4. A self-employed parent "will not be allowed to avoid a support obligation by arranging a smaller salary while the business prospers." *Allen v. Allen*, No. M1999-00748-C0A-R3-CV, 2000 WL 1483389, at *4 (Tenn. Ct. App. Oct. 10, 2000).

"Where issues are raised about actual income from self-employment, information beyond pay stubs or individual tax returns may be needed." *Eatherly*, 2001 WL 468665, at *5. Determining income from self-employment may require "scrutiny of various aspects of the parent's business." *Id.* at *6. "Courts and parties find themselves in a serious quandary when the evidence of the [] parent's income is incomplete." *Kirchner v. Pritchett*, No. 01A01-9503-JV-00092, 1995 WL 714279, at *2 (Tenn. Ct. App. Dec. 6, 1995). However, "the guidelines are not intended to permit [] parents to avoid their obligation to support their children simply by keeping inadequate records of their income and expenses or by resisting appropriate discovery requests for this information." *Id.* at *3.

Thus, the question becomes whether the record contains "reliable evidence" to establish the parent's income. *See Garrett*, 2014 WL 3763806, at *11. We must also determine whether the trial court made "an accurate assessment" of potential income. *Hyden v. Hyden*, No. 02A01-9611-CH-00273, 1997 WL 593800, at *3 (Tenn. Ct. App.

23

Sept. 25, 1997). "A parent's potential income is a question of fact." *Sitz v. Sitz*, No. E2012-01726-COA-R3-CV, 2013 WL 5450416, at *11 (Tenn. Ct. App. Sept. 30, 2013). Determining a party's potential income is a factual question that requires careful consideration of all the attendant circumstances. *Small v. Small*, No. M2009-00248-COA-R3-CV, 2010 WL 334637, at *5 (Tenn. Ct. App. Jan. 28, 2010) (finding the evidence preponderated against the trial court's imputation of an earning capacity of $500,000 per year when the trial court did not explain its basis for imputing this amount and the evidence in the record did not support it).

The case before us is analogous to *Miller v. Welch*, 340 S.W.3d 708, 710 (Tenn. Ct. App. 2010), where the father was a licensed attorney working as a solo practitioner and claimed very little income. The father testified that his gross income in the past two years was around $50,000 but that his net income was only about $18,000. *Id.* at 710. However, the father's lifestyle led the trial court to conclude that "there's no way what you're showing in your income is accurate." *Id.* at 711. The father drove an expensive Mercedes, and his expenses just for his office rent, housing, and car payment exceeded his reported net income. After adding up all of his monthly expenses, the trial court concluded that the father had the ability to make $40,000 per year in income. On appeal, we concluded that the evidence did not preponderate against the trial court's finding that Father was capable of making (or actually was making) $40,000 per year. *Id.* at 713.

As in *Miller*, we believe the evidence in this case shows that Father's income is greater than he claimed at trial. "If [his] net income was as low as he claimed, he simply could not be paying the expenses that he was incurring." *Id.* at 713. The trial judge was, justifiably, unimpressed with Father's evidence regarding his income. He warned Father that he did not intend to spend days "chasing down" Father's financial information and that it was Father's burden to convince the court as to the amount of his income. Father had been a licensed attorney for ten years. When Father was repeatedly asked about his income during discovery, he would simply refer Mother to his tax returns. However, Father's tax returns showed little to no income. Father even refused to produce his proposed child support worksheet in response to discovery on the basis that it was protected by attorney-client and work product privilege.

When pressed at trial, in 2015, about his income, Father directed the court and Mother's counsel to simply "look at Schedule C" of his tax returns, where they would see for the past two years "income generally somewhere between $18,000 and, I think, $22,000 in 2013." Father's 2012 tax return showed only $5,693 in adjusted gross income but $174,221 in gross income for his law practice. (He claimed $153,137 in business expenses for a profit of only $21,084.) Father's 2011 tax return reflected a negative adjusted gross income (in the sum of negative $7,937). For 2011, Father's law practice

24

had gross income of $114,686, but Father claimed $110,364 in business expenses. Father testified that his income for 2011 should be set based on his net business income of $4,322 reflected on his Schedule C. Father acknowledged that "at mediation there was discussion of income and that it was somewhere generally on the best years between 30 and $36,000," but he did not specify in which years this occurred or whether this amount was based on adjusted gross income, net business income, etc.

Even though the proof of Father's self-employment income has been at issue since the inception of this litigation, he maintained little documentation of his income and expenses. Father insisted that he had no financial statements, profit and loss statements, income statements, year-end balance sheets, asset and liability schedules, general ledgers, or supporting documentation for his business expenses aside from his bank and credit card statements. According to Father, he prepared his tax returns simply by looking over his bank and credit card statements and adding the amounts he discerned as business expenses with a calculator. He suggested that Mother's counsel could have determined his business expenses in the same way, by reviewing his many bank and credit card statements and sorting through the charges. Understandably frustrated by Father's evasiveness, the trial judge said it was like having "to pull teeth to figure out [Father's] income."

Finally, in October 2015, near the end of the seven-day trial, Father produced his 2014 income tax return for the first time. Father's 2014 return showed an adjusted gross income for Father of just $15,862. The 2014 return showed $181,222 in gross income for Father's law practice but $159,356 in expenses, for a net business profit of $21,866.

Despite Father's claims of little to no income, Father was paying $3,000 per month for television advertising and over $4,000 per month in office rent for his solo practice. He also claimed monthly personal expenses of approximately $3,500. In the midst of this litigation, Father decided to purchase a home owned by his parents where he had lived rent-free for ten years. Father executed a contract to buy the home for $75,000 to be paid in full over a term of two years. As a result, Father made several lump sum payments to his parents during this litigation ranging from $14,000 to $28,000. Father also enrolled Samuel at another daycare because Father was uncomfortable at Samuel's regular preschool and refused to take him there on Father's single weekday of parenting time. He was charged the full-time rate and paid $8,000 over a period of months for this duplicate expense.

The evidence supports the trial court's finding that Father's evidence reflecting such little income is not reliable or trustworthy. Father's self-employment certainly offers him the opportunity to manipulate his income. And, as the trial judge observed

during trial, Father is a tax attorney and "would be an expert in cooking the books if he wanted to [do so]." The trial court found that by the time of trial, *Father* "still had not produced adequate documentation to establish his income for child support purposes." However, the trial court implicitly found *other* reliable evidence in the record to support a finding of Father's income *potential*, as it did not impute the median amount to Father. The trial court provided the following explanation for its imputation of $10,000 in monthly income:

> As previously stated, [Father] is found in contempt of Court for failing to comply with discovery regarding his income and finances. The Court further found that Father failed to provide reliable information of his income. The law will not allow Father to escape paying child support simply by refusing to show truthful proof of income. [Father] is a very intelligent licensed practicing attorney in business since 2006. He owns his own home, having paid $70,000.00 on it over a period of little more than 3 years, with only a balance of $5,000.00 owed on same. He has had three different attorneys representing him over the course of these proceedings. He hired his own independent expert witness for trial. He was able to pay for [a second] Day Care, a duplicate and totally unnecessary expense, since the child was already enrolled at [his regular preschool]. [Father] never provided Dr. Steinberg any of his requested financial information that was an important part of his evaluation. All of these factors along with other evidence of [Father's] professional and personal lifestyle do not make sense when compared with [Father's] alleged destitute financial condition. The Court has determine[d] [Father's] *earning capacity* and has imputed income to him of $10,000.00 per month.

(Emphasis added.)

Although we sympathize with the trial court's plight considering Father's evasiveness, we simply cannot discern any basis for how the trial court reached a monthly earning capacity for Father of $10,000 per month. Mother had originally asked the court to impute $20,000 in monthly income to Father, and the trial court chose to impute $10,000 instead. "A finding of potential income must have an evidentiary basis." *Eatherly*, 2001 WL 468665, at *11. "The determination of potential income must be supported by evidence in the record." *Chorost v. Chorost*, No. M2000-00251-COA-R3-CV, 2003 WL 21392065, at *9 (Tenn. Ct. App. June 17, 2003) (citing *Eatherly*, 2001 WL 468665, at *11; *Allen*, 2000 WL 1483389, at *6). *See, e.g.*, *Cook v. Iverson*, No. M2014-01206-COA-R3-CV, 2015 WL 7748798, at *7 (Tenn. Ct. App. Nov. 30, 2015) (remanding where the trial court found Father had the ability to earn $16,500 per month,

but the evidence did not support the amount imputed and the trial court referenced Father's past employment but acknowledged that particular figure could be "pie in the sky"); *Kelly v. Kelly*, No. M2010-00332-COA-R3-CV, 2011 WL 310544, at *5-6 (Tenn. Ct. App. Jan. 20, 2011) (concluding that the record did not support the trial court's imputation of income at minimum wage level and remanding for a determination of earning potential or in the absence of reliable evidence imputation of income at the median amount); *Kaplan v. Bugalla*, No. M2006-02413-COA-R3-CV, 2007 WL 4117787, at *6 (Tenn. Ct. App. Nov. 16, 2007) (finding insufficient information to support the trial court's finding on income potential and remanding for determination of "a reasonable monthly income"); *Radebaugh v. Radebaugh*, No. M2005-02727-COA-R3-CV, 2006 WL 3044155, at *11-12 (Tenn. Ct. App. Oct. 26, 2006) (vacating and remanding for the trial court to recalculate the self-employed parent's income using reliable information relating to gross receipts and reasonable business expenses); *Eatherly*, 2001 WL 468665, at *11 (vacating and remanding for further fact-finding regarding the father's potential income); *Allen*, 2000 WL 1483389, at *6 (remanding because it was unclear how the trial court reached a particular income figure); *State ex rel. Rion v. Rion*, No. 01A01-9704-CV-00194, 1997 WL 796212, at *3 (Tenn. Ct. App. Dec. 31, 1997) (finding insufficient evidence to support the trial court's finding of income potential and remanding for further proceedings).

On remand, the trial court should consider the self-employment guidelines to determine whether Father's claimed business expenses are reasonable or excessive. *See Radebaugh*, 2006 WL 3044155, at *11-12. It must also provide sufficient factual findings so that we can discern how the trial court determined Father's monthly income or income potential. In its discretion, the trial court may solicit additional proof as to Father's true earning potential and calculate income based on that information, or it may proceed based on the evidence already in the record.

At this point, we find it appropriate to also discuss the trial court's reference to its imputation of income as a sanction for civil contempt and/or discovery abuses. In *Gibson v. Prokell*, No. 02A01-9701-CH-00006, 1997 WL 759446, at *3 (Tenn. Ct. App. Dec. 10, 1997), *perm. app. denied* (Tenn. Jun. 8, 1998), a parent deliberately failed to comply with court orders compelling discovery regarding his financial information in connection with his child support obligation. Citing Tennessee Rule of Civil Procedure 37, among others, the trial court set child support based on the amount of his gross income minus taxes paid. *Id.* at *7. On appeal, this Court upheld this decision, concluding that the trial court was justified in using the amount of gross income minus taxes paid under the circumstances. *Id.* We recognized that "[w]ithout complete information, the trial court would be forced to piece together the puzzle of child support using fragments of

information." *Id.* We noted that the court was expressly authorized by the Rules of Civil Procedure to impose sanctions for the parent's failure to comply with discovery orders. *Id.* at *8. We explained,

> Prokell has consistently refused to comply timely and completely with the trial court's orders. Orders of the trial court cannot be taken lightly as evidenced by the full sanctioning power bestowed upon the courts of this state. This Court stated in *Kirchner v. Pritchett*, No. 01-A-01-9503-JV00092, at 3 (Tenn. Ct. App. December 6, 1995):

>> The risk of failure or inability to produce evidence of the noncustodial parent's income and expenses should not fall on the custodial parent. This information is within the noncustodial parent's control. Thus, if the noncustodial parent has failed or refused to produce evidence of his or her income prior to the hearing, the burden of producing satisfactory evidence of income and expenses should be placed on the noncustodial parent--the party most able to provide it.

> Undoubtedly, Prokell is the noncustodial parent and is in a much better position to obtain the information requested. Therefore, he bears the risks of his failure or refusal to produce evidence of his income and expenses, and he suffers the consequences when these risks materialize in the form of penalties for his non-compliance. In this cause, that risk of non-compliance manifested itself in the form of court ordered sanctions, orders of contempt, and a permanent award of child support coupled with a reducing of arrearages to judgment. As shown above, the trial court is provided with the most severe spectrum of sanctions to carry out its discovery orders. Finding no abuse of discretion, we affirm the trial court's sanctions imposed upon Prokell including the granting of permanent child support and reducing of arrearages to judgment.

*Id.* at *8.

In the case before us, the trial court did not include any reference to or discussion of Tennessee Rule of Civil Procedure 37 or related rules regarding discovery sanctions. The order simply states,

28

The Court finds by clear and convincing evidence that Father is guilty of civil contempt for his failure to comply with discovery orders regarding financial discovery. The Court finds that Father should be sanctioned for his willful conduct and further, he has still failed to submit any reliable and trustworthy evidence of his income pursuant to the Guidelines, Father's income for the purpose of calculating child support shall be imputed in the amount of $10,000.00 per month.

This same order states that the trial court "determine[d] [Father's] earning capacity and has imputed income to him of $10,000.00 per month." The trial court's order from the subsequent child support hearing further states, "For [Father's] failure to comply with financial discovery he was sanctioned and that, *along with other factors*, resulted in his income being imputed." (Emphasis added.) When the issue of imputation of income was discussed in the order denying Father's recusal motion, the trial judge explained,

[T]he Court found Father had failed to comply with Court orders regarding financial discovery and that he should be sanctioned and further that he failed to submit reliable and trustworthy evidence of his income pursuant to the guidelines and that the Court could not determine what [Father's] income was. On page 22 and 23 of the Order the Court set out in detail the factors it used in imputing income to [Father], *all of which was upon the evidence and nothing more*, and will be supported by the record.

(Emphasis added.) Thus, it appears that the trial court imputed income not fully as a discovery sanction but at least in part based on its conclusion that doing so was warranted by the evidence presented and in accordance with the guidelines. For the reasons already discussed, we cannot conclude from the trial court's limited findings whether the calculation of $10,000 in monthly earning capacity was justified under the guidelines.

Our decision does not foreclose the trial court from considering the issue of discovery sanctions on remand if in fact the court intended to impute income as a discovery sanction. However, the trial court must include sufficient findings in its order for this Court to know how and why the court has made its decision. "[A]ny sanction imposed by a trial court for a discovery abuse must be tempered by the requirement that the punishment be 'just.'" *Murray v. Beard*, No. E2006-01661-COA-R3-CV, 2007 WL 2437971, at *6 (Tenn. Ct. App. Aug. 29, 2007); *see* Tenn. R. Civ. P. 37.02.

29

## 2. Mother's Income

Mother worked as an attorney at a Memphis law firm and also worked as a certified yoga instructor. Father argues that the trial court erred "by accepting Mother's clearly unreliable tax returns as sufficient evidence of her income and earning capacity" because Mother's returns included "clearly erroneous deductions to her income." First, he argues that Mother "included deductions for mileage for traveling for her yoga instruction when the only place she taught yoga was in the same building as her law practice." However, this fact alone does not lead us to conclude that Mother's tax returns were unreliable. Mother testified that aside from her regular mileage for driving to teach yoga at the building where her law office is located, she also drove to various locations for continuing education and training, including locations in Middle Tennessee and St. Louis, Missouri.

Next, Father complains that Mother's tax return included a deduction for utility payments at her law office. Father's only argument regarding this issue is the following statement: "This is a markedly erroneous deduction as Mother was a contract employee of the law firm, not a partner, shareholder or otherwise considered an owner of same, and she is not entitled to any such deduction."[12] Because Father provides no legal authority to support this bare assertion, we decline to consider the issue further.

> It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.

*Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010). "A skeletal argument that is really nothing more than an assertion will not properly preserve a claim, especially when the brief presents a multitude of other arguments." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006). In sum, the two deductions Father discusses on appeal do not lead us to conclude that the

---

[12]Father suggests that "[a]t the very least," the trial court should have sanctioned Mother for failing to respond to his discovery requests, as she provided him with no documentation supporting these particular deductions. However, he does not cite to any location in the voluminous record to reflect that he filed a motion for sanctions on this basis. Father also failed to list any issue on appeal regarding discovery sanctions against Mother. *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) ("an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)").

trial court erred in finding that Mother's tax returns constituted reliable evidence of her income.

### D. *Attorney's Fees*

The next issue raised by Father is "[w]hether the Trial Court committed reversible error by awarding attorney fees to Mother in its final order when it expressly denied Father's counsel an opportunity to challenge the reasonableness of the fees." In the trial court's March 17, 2016 order, which was entered after the original seven days of trial, the court ruled that Mother was entitled to an award of reasonable attorney's fees, as Father's conduct left her no choice but to seek relief from the court. The trial court directed Mother's attorney to submit a sworn statement of time and expenses. During a subsequent conference call among the trial judge and the attorneys, when various issues were discussed, the trial judge instructed Mother's counsel to submit additional documentation and itemization of her fees beyond what she had already submitted. Mother's counsel then asked the trial judge if he intended to rule on that issue without a further hearing. The trial judge responded "I plan to." He added,

> THE COURT: I don't really plan to have a hearing where I am going to allow Mr. Timmons to go through and nitpick your bill. I am just not going to do that. Now, I will go through and look at the bill and look at the time that was expended for various issues. And it may be the Court will allow attorney fees for certain portions of the proceeding and it may be that the Court will not allow an award for other services. So I am just going to go through and look at it and study it closely and the Court will make a decision on the attorney fee.

> MS. PUTNUM: All right. And, Your Honor, I will do my best to make the affidavit as clear for both you and Mr. Timmons as I possibly can.

> THE COURT: All right. Anything else we need to address?

Father's counsel made no comment about the issue of attorney's fees or the need for a hearing. He never requested a hearing either before or after this exchange during the teleconference or otherwise. At the conclusion of the subsequent child support hearing, the trial judge reminded Mother's counsel to file another supplement with her additional time for the child support hearing. The trial judge said he would study all of the information carefully and try to make an accurate determination of attorney's fees and issue a ruling as quickly as possible. Father's counsel simply responded, "Thank you,

Your Honor," with no mention of the need for a hearing. The trial court ultimately awarded Mother $145,406.15, which was less than the amount reflected on her attorney's affidavit of fees and expenses, totaling around $200,000.

"'[A] trial court is not required to hold a hearing as to the reasonableness of the amount of attorney's fees awarded unless a party makes a timely request.'" *Talley v. Talley*, No. E2016-01457-COA-R3-CV, 2017 WL 1592770, at *14 (Tenn. Ct. App. May 1, 2017) (quoting *Cremeens v. Cremeens*, No. M2014-01186-COA-R3-CV, 2015 WL 4511921, at *12 (Tenn. Ct. App. July 24, 2015)).

> [A] trial judge may fix the fees of lawyers in causes pending or which have been determined by the court, with or without expert testimony of lawyers and with or without a prima facie showing by plaintiffs of what a reasonable fee would be. Should a dispute arise as to the reasonableness of the fee awarded, then in the absence of any proof on the issue of reasonableness, it is *incumbent* upon the party challenging the fee to pursue the correction of that error in the trial court by insisting upon a hearing upon that issue.

*Kline v. Eyrich*, 69 S.W.3d 197, 210 (Tenn. 2002) (quotations and bracketing omitted). In the absence of any request for a hearing, the party challenging the fee on appeal must "convince the appellate courts that he was denied the opportunity to do so through no fault of his own." *Moran v. Willensky*, 339 S.W.3d 651, 664 (Tenn. Ct. App. 2010). Father has not met this burden. He simply never requested a hearing before the trial court on the issue of attorney's fees. When the trial judge stated during the teleconference, upon being asked by *Mother's* counsel, that he did not plan to have a hearing, Father's counsel stood by silently and never stated that he desired such a hearing. Father did not object to the affidavit and itemization submitted by Mother's counsel or submit any evidence to dispute them. At the end of the child support hearing, the trial judge indicated that he intended to review the attorney's fee affidavit and make a ruling as quickly as possible, and Father's counsel simply thanked him without any objection to that procedure. Father has not convinced this Court that he was denied the opportunity to request a hearing.

## E.    *Disqualification of Mother's Counsel*

Finally, Father argues that the trial court erred by failing to disqualify Mother's counsel because she "was an important fact witness regarding the interaction of the parties and Father's parenting[.]"  Very early in this lengthy proceeding, on September 10, 2012, Father filed a motion to disqualify Mother's attorney, Ms. Putnam.  A hearing on other matters was already scheduled for that same day.  At the hearing, the trial judge and the attorneys discussed the motion to disqualify filed that morning.  The parties were already scheduled to attend mediation later that month.  Ms. Putnam's co-counsel, Mr. Hodum, suggested that if the court was inclined to allow the parties to proceed with mediation, that would allow Ms. Putnam time to confer with the Board of Professional Responsibility and determine whether disqualification was warranted.  The trial judge approved of this suggestion and expressed his hope that the parties could narrow the issues during mediation, but he added that "if the Court has to hear some proof on that I will."  The following exchange occurred:

> THE COURT: And then if, in fact, we're going to go to trial and the question is whether or not she's going to participate in the trial, then if the Court had to hear it I could hear it.
>
> MR. HODUM: I have no problem doing that whatsoever. That would be fine.
>
> MR. TIMMONS: That's absolutely fine with us, your Honor. We're just going to defer that issue to October 1st if it needs to be heard.
>
> MR. HODUM: Yeah.
>
> THE COURT: Okay. So we'll -- we will come back on October 1st, I'll hear the status of the mediation, and then I'll take up any loose ends.
>
> . . . .
>
> MR. TIMMONS: Well, we resolved, at least temporarily, the Motion to Recuse or rather to disqualify Ms. Putnam in that Mr. Hodum is going to handle mediation. If we have to take that up we can have it well briefed and we can have conferred and Ms. Putnam will have had time to confer with the Board.

The issue of disqualification was never pursued after mediation despite the years of ensuing litigation with Mother being represented by Ms. Putnam.  The record contains no support for Father's assertion on appeal that the trial court "failed to give proper consideration" to his motion for disqualification or "disregarded Father's right to even be

33

heard on the merits of his motion." Court of Appeals Rule 6 requires the appellant to cite to the record to show where an alleged error was "'seasonably called to the attention of the trial judge.'" *Moran*, 339 S.W.3d at 664. Because it is incumbent for a party to take whatever action is reasonably available to prevent or nullify the harmful effects of an error, Tenn. R. App. P. 36(a), Father cannot complain about this issue on appeal having abandoned it before the trial court.

## IV. CONCLUSION

For the aforementioned reasons, the portions of the trial court's order regarding imputation of income and child support are vacated and remanded for further proceedings, but the decision of the juvenile court is otherwise affirmed. Mother's request for attorney's fees on appeal is respectfully denied.[13] Costs of this appeal are taxed to the appellant, J. Vincent P., and his surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE

---

[13]In the conclusion section of her appellate brief, Mother requested an award of attorney's fees incurred in defending this appeal. However, Mother did not cite any basis for such an award or designate this request as an issue on appeal in a statement of the issues section of her appellate brief. We therefore deem the issue waived. *See Naylor v. Naylor*, No. W2016-00038-COA-R3-CV, 2016 WL 3923790, at *4 n.2 (Tenn. Ct. App. July 15, 2016) (*no perm. app. filed*); *Howard v. Howard*, No. E2015-00908-COA-R3-CV, 2016 WL 3910262, at *2 n.3 (Tenn. Ct. App. July 13, 2016) (*no perm. app. filed*); *Rigsby v. Rigsby*, No. E2014-02095-COA-R3-CV, 2015 WL 7575075, at *7 (Tenn. Ct. App. Nov. 25, 2015); *Culpepper v. Culpepper*, No. E2014-00815-COA-R3-CV, 2015 WL 6735909, at *6 (Tenn. Ct. App. Nov. 4, 2015).